Yukiyasu ISHIGAMI, Plaintiff,

v.

The UNIVERSITY OF HAWAII, as a Body Corporate, the Board of Regents, University of Hawaii, Fujio Matsuda, Individually and as President of the University of Hawaii, and Agnes Niyekawa-Howard, Individually and in Her Capacity as Chairman, Department of East Asian Languages, University of Hawaii, Defendants.

Civ. No. 77–0056.

United States District Court, D. Hawaii.

Feb. 28, 1979.

John S. Edmunds, Honolulu, Hawaii, for plaintiff.

Ronald Y. K. Leong, Deputy Atty. Gen., Cynthia Winegar, William J. N. Garcia, Deputy Atty. Gen., Honolulu, Hawaii, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

### STATEMENT OF THE CASE

Yukiyasu Ishigami, formerly an instructor in the Department of East Asian Languages at the University of Hawaii, applied for and was denied tenure. This occurred in 1974.

He claims that this denial resulted from various violations by Agnes Niyekawa-Howard, Chairman of the Department of East Asian Languages, and by Fujio Matsuda, President of the University of Hawaii, and by the Board of Regents of the University of Hawaii, of his constitutional and contractual rights. He therefore filed this § 1983 and pendent contract action against these persons and against the University of Hawaii itself.

### THE FIRST APPLICATION FOR TENURE

In the academic year 1974–1975, Mr. Ishigami applied for tenure at the University of Hawaii. He had been appointed as an instructor of Japanese in the Department of East Asian Languages commencing September 1, 1971. Renewals of this appointment for periods of one year each followed, effective July 1 of 1972, 1973, and 1974.

For his rank, the normal probationary period was four years. In accordance with University procedures, an application for tenure would normally be made in his final probationary year, which was the academic year 1974–1975. He was reminded of this by memorandum dated August 20, 1974, from Dr. Niyekawa (formerly Niyekawa-Howard) as Chairman of the Department. Attached to the memorandum were two sets of Faculty Promotion and Tenure Recommendation forms for his use. These he duly completed and submitted in a timely manner.

Tenure applications such as Mr. Ishigami's pursue a tortuous course at the University. They go (a) to the Department Personnel Committee (DPC) for faculty review, then (b) to the Department Chairman (DC) for administrative review, then (c) to a College Personnel Committee (CPC) for faculty review, then (d) to the college Dean for administrative review, then (e) to the Manoa Faculty Personnel Committee (MFPC) for faculty review, then (f) to the Manoa Chancellor (MC) for administrative review, then (g) to the President for final recommendation, then (h) to the Board of Regents for decision.

The DPC voted 11 "Recommended" 3 "Not Recommended" and 3 "Abstain." After a discussion, this vote was decided to be interpreted as "recommended" for tenure. The DC forwarded the application with the endorsement "Not Recommended." The CPC voted 1 "Recommended" and 6 "Not Recommended." The Dean voted "Not Recommended." The MFPC voted "Not Recommended" with the notation "consensus." The MC voted "Not Recommended." This process took from September 13, 1974, to April 16, 1975. The President concurred in recommending against tenure. By letter dated May 15, 1975, the Dean so notified Mr. Ishigami. The letter also pointed out that in accordance with University regulations Mr. Ishigami was entitled to a terminal year of employment upon denial of tenure if he wished to exercise this option.

Meanwhile, the University of Hawaii Professional Assembly (UHPA) had been rec-

ognized as the exclusive representative of the faculty of the University of Hawaii, including the Community Colleges, by virtue of procedures permitted under Hawaii's unique law giving government employees essentially the same rights of collective bargaining as private employees. On March 18, 1975, the University and the Assembly had entered into an agreement covering, among other matters, tenure and grievance procedures if a faculty member is "dissatisfied" with the tenure decision. Mr. Ishigami duly filed a grievance based on the denial of tenure in a timely manner on June 3, 1975 (alleging a violation on May 15, 1975).

The formal grievance procedure under the contract provides for four steps. Step 1 did not apply in this case as the contract provides that grievance based upon negative tenure and promotion recommendations may commence at Step 2. Hence Mr. Ishigami's grievance started at Step 2, which is an appeal to the "chancellor." Step 3 is an appeal to the President. Step 4 is binding arbitration. Mr. Ishigami lost his appeals at Steps 2 and 3, but won a partial victory from the arbitrator at Step 4.

Daral G. Conklin, Esq., as Arbitrator, decided on February 10, 1976, that "the University official's decision in this matter was arbitrary." He ordered that:

(a) All documents involved in this Grievant's dossier, including *all* documents submitted by him in his original application, and *all* documents presently in his dossier, shall be appropriately gathered and retained in a New Dossier, and his application for tenure re-submitted *ab initio*, unless he shall elect not to so apply anew;

(b) Each party shall have the right to add such additional documents and things to the New Dossier as such party may deem appropriate, consistent with existing rules and procedures;

(c) The application shall be considered and reviewed by the University strictly in conformity with its presently existing rules and procedures;

(d) All reasons for whatever recommendation is made, at all levels, must in fairness be set forth, and the Regents' policy regarding the "flagging" of certain dossiers must be followed, if such flagging shall become applicable under the New Dossier.

The Arbitrator neither expresses nor infers any opinion as to whether tenure should or should not be granted to this Grievant, because the Arbitrator has no such opinion.

The Arbitrator's reference to "*all* documents" took cognizance of the fact that Dr. Niyekawa had called the writer of a letter favorable to Mr. Ishigami to discuss the basis for the writer's favorable statements, had obtained a second watered-down letter of recommendation from the same writer, and then had removed the first letter from Mr. Ishigami's dossier, all without Mr. Ishigami's knowledge at the time.

Certain other paragraphs from the arbitration decision are pertinent to this dispute and are quoted in full.

. . . [T]he grievant has demonstrated the University, in this *particular* matter, to have been bureaucratic if not downright stupid. Among other things, the University apparently solicited a substitute letter of "recommendation" for an original recommendation letter which original thereafter was not left in the Grievant's dossier. Moreover, it appears that a number of the Department Chairman's bases or reasons for negative recommendation were substantially irrelevant or inapplicable. The Arbitrator is in a quandary as to why those bases and reasons were stated, since that Chairman was not called as a witness by either party; the Arbitrator declines to comment further because that Chairman has not had opportunity to defend herself.

. . . [I]t appears more likely true than not true that a decision which specifies extraneous or inapplicable criteria is at least in part arbitrary.

But from that conclusion, the Arbitrator cannot decide that tenure must be granted in this instance.

## THE SECOND APPLICATION FOR TENURE

And so Mr. Ishigami applied for tenure all over again on April 5, 1976. For this second application, the procedures, the forms, and the criteria had changed. Mr. Ishigami testified that he objected to Dr. Niyekawa remaining in the review process, and that he expected the 1974–1975 criteria to be applied. His evidence in support of these contentions was a letter dated March 10, 1976, to him, from Mr. Comcowich, the Executive Secretary of UHPA, that Mr. Comcowich had discussed these points with Mr. Harold Masumoto. Mr. Masumoto is in the President's office. Apparently Mr. Masumoto did not feel called upon to take any action with regard to the matters discussed with Mr. Comcowich. At any rate, no such action was taken and the second review process went forward with Dr. Niyekawa as DC and based on the new criteria, as set forth in Vice Chancellor Ashton's memorandum of March 5, 1976.

In this connection, Mr. Ishigami had received a document entitled "Instructions for Applicants for Tenure 1975–1976" which reads in part:

*The options open to you*

Article IV of the [UH/UHPA] Agreement defines when you should normally apply for tenure. You have several options:

1. You may decide to proceed with your tenure application having read the department criteria. Sign C(1) on page 2 of the application form and make sure you meet the deadlines established.

2. You may read the criteria but decide to wait a year because you may have a better chance of meeting the criteria then, or you have not seen the criteria before, didn't know what they were, and feel you need a year to adjust to them, then option C(2) on page 2 is for you.

3. You may read the criteria and not wish to bother applying for tenure; then option C(3) on page 2 may be your choice. If you choose this option your contract with the University will terminate on June 30, 1977, unless you choose to resign before that date.

These options are clearly set out on page 2 of the tenure application form. Mr. Ishigami signed for option C(1) on April 5, 1976.

The change in criteria were of significance to Mr. Ishigami. The 1971 goals of the East Asian Languages Department as enunciated by the then DC included a need for Category IV faculty members, who were defined as follows:

4. Category IV comprises language teachers who are not graduate-oriented. They should have native or near-native language competence, need not be versed in linguistics or other academic subjects, and are not required to publish scholarly studies, though they are encouraged to produce formal or informal language-teaching materials. Excellence in language teaching is the chief requirement for this category.

A statement in 1975 entitled "Criteria for Tenure and Promotion" for the Department eliminated all categories of faculty members. Instead it emphasized the overall needs of the department and mentioned teaching, collegiality, research, service, and general consideration. As Mr. Ishigami's strong point was teaching Japanese—he is a native speaker of Japanese, a graduate of Keio University, and an alien of Japanese ancestry—this redefinition of the department's goals could have affected him adversely.

As an aside, Mr. Ishigami's then existing contract with the University terminated on June 30, 1976. He was unemployed during the summer, then started at Punahou School teaching Japanese. His salary was substantially lower than as an instructor at the University.

At any rate, Mr. Ishigami's second application for tenure went forward. The DPC voted 12 for 3 against 4 abstain. The DC voted against. The CPC voted unanimously 8 against. The Dean voted against. The MFPC (also MCFPC) voted 17 against 1 abstain. The MC voted against. The Presi-

dent voted against. By letter dated June 17, 1976, the Dean informed Mr. Ishigami that he would not be granted permanent academic tenure and that 1975–1976 was his terminal year of employment. (He was not given the option of an additional year after denial of tenure "[i]nasmuch as this represents a reaffirmation of the decision made a year ago"; that is, he already had received the additional year.)

Mr. Ishigami grieved again. He filed a Step 2 grievance with the MC on July 8, 1976 (alleging a violation of June 18, 1976). In this grievance he complained of the use of the new tenure criteria of the Department, claimed that the DC had again given inadequate and improper reasons for her negative recommendation, and referenced his earlier grievance. This appeal was apparently denied, although I find nothing in writing from the chancellor as required by the UH/UHPA contract.

Mr. Ishigami pursued Step 3 of the grievance procedure, to the President (or his designee), on September 13, 1976. Kenneth K. Lau, Esq., the President's designee, rendered his written Step 3 decision on October 8, 1976, denying the grievance. In his decision, Mr. Lau notes the objections to the use of 1975–1976 criteria and to the failure of Dr. Niyekawa to remove herself from the reviewing process. His answer is that the Arbitrator directed that the second application be reviewed in conformity with "presently existing rules and procedures" and did not direct the DC to disqualify herself from the reconsideration process.

In this connection, it nowhere appears that Mr. Ishigami asked the Arbitrator to direct Dr. Niyekawa's disqualification or that he even raised her presence in the review process as a ground for his grievance.

By letter dated October 18, 1976, Mr. Ishigami requested the UHPA to proceed with his grievance to a Step 4 arbitration. Proceeding with arbitration is within the UHPA's discretion. By letter dated November 26, 1976, the Executive Secretary of UHPA advised Mr. Ishigami that the UHPA Board of Directors had voted at its meeting on November 13, 1976, not to take his grievance to arbitration.

This suit was filed on February 22, 1977.

## PROCEDURAL DUE PROCESS ALLEGATIONS

The complaint recites what happened to Mr. Ishigami but adds a few verbs and adjectives and charges which place what I have set forth above in a different light.

Mr. Ishigami alleges that he "moved to disqualify" Dr. Niyekawa from participating in the reconsideration of his tenure "on the grounds of bias and prejudice" but that she "refused to disqualify herself."

If this did happen, Mr. Ishigami has failed to prove it. The evidence before me shows that he did not raise this issue directly until his Step 2 grievance after having been denied tenure again. There is that elliptical reference to the matter in Mr. Comcowich's memorandum regarding a conversation with Mr. Masumoto. Neither individual was in the review process; there is no evidence that Mr. Ishigami followed up on this objection with Dr. Niyekawa, or with the Dean, or with the Chancellor. Nor does his claim of prejudice appear anywhere until this suit was filed insofar as he is claiming prejudice against him.

■ Mr. Ishigami alleges that the reconsideration of his application for tenure should have applied the same criteria as had been applied in the consideration of his first application. The only difference that I am aware of flows from the validation on December 10, 1975 of the "Criteria for Tenure and Promotion" issued by Dr. Niyekawa in place of the earlier 1971 memorandum regarding categories of faculty members in the East Asian Languages Department, both of which are cited above. The basic overall policies of the University regarding tenure remained the same.

Dr. Niyekawa did testify that, had Mr. Ishigami's application been processed a few years earlier, he probably would have received tenure. This is because his strengths lie in the area of teaching the Japanese language. But as of 1974–1975, she testi-

fied, the Department had all the native speakers of Japanese they needed and were looking for additional or other academic strengths. So perhaps the change from a 1974–1975 review to a 1975–1976 review did adversely affect Mr. Ishigami.

The answer to Mr. Ishigami is that the Arbitrator so ordered. The Arbitrator's decision clearly directed that a "New Dossier" be made up, that the application for tenure be resubmitted "*ab initio*," and that the application shall be considered and reviewed "strictly in conformity with . . . presently existing rules and procedures."

Furthermore, even the earlier 1971 draft handbook guidelines contained the caveat that Category IV faculty members belong to a group "who in most institutions are either not particularly welcome or have at best a temporary and uncertain status." The proposed handbook goes on to state that the department "is unique in the extent to which it welcomes good language teachers who fall into these categories, especially category IV." For this category, there is the "possibility of attaining tenure, number to be determined by present and future needs of the Department." Mr. Ishigami was, prior to the abolition of these categories, a Category IV faculty member.

It is to be noted here also that the general 1974–1975 University policies allowed for reapplications for tenure to be made during an individual's terminal year after a previous negative decision. However, when allowed, the reapplication must show how the earlier deficiencies have been removed and "should not be merely a resubmission of the initial application." This was changed in the "Instructions for Applicants for Tenure 1975–1976," quoted above, with its three options.

One of the 1975–1976 options was to have the probationary period extended by one year, but to be evaluated by the same criteria as in the year in which the option was exercised. The complaint alleges that "although this option was given to other tenure applicants eligible for tenure in 1976, Defendants denied this option to Plaintiff." There is no evidence that Mr. Ishigami ever attempted to exercise this option or that he was told by anyone that he could not. This option C(2), appears clearly set forth on the form he signed and on which he chose option C(1).

If we read the Arbitrator's decision as permitting Mr. Ishigami to choose option C(2), then we have a conflict with the provision of Article IV B 2 (b) of the UH/UHPA contract that "in no instance may the total full-time probationary service exceed five (5) years." In any event, the evaluation would clearly be in accordance with the new 1975–1976 criteria.

Mr. Ishigami alleges that he did not have "fair and adequate notice of what criteria would be applied in re-evaluating him for tenure." The evidence is clear that he was in receipt of a copy of the December 1975 "Criteria for Tenure and Promotion" applicable to his department long before he reapplied on April 5, 1976. Also prior to the reapplication, by memorandum dated March 5, 1976, Vice Chancellor Ashton advised Mr. Ishigami specifically as follows:

This is to advise you that, pursuant to the decision rendered in your case by Arbitrator Daral G. Conklin, the University of Hawaii will consider your tenure application according to the criteria and procedures applicable during the current academic year (1975–76) within the following time schedule:

1. Your application for tenure will be considered *ab initio* according to the criteria approved for your department by the Council of Academic Deans on December 10, 1975. I understand you have been provided with a copy of these criteria by your department chairperson.

2. Your application will be considered according to the procedures established for tenure application for 1975–76. I understand you have been provided with a tenure application form by Dean Olsen.

3. Your application must be submitted to the [DPC] no later than 21 days from the date of receipt of this memorandum.

4. Each committee and administrator in the review process will be expected to review your application expeditiously. . . .

I am returning a complete copy of your 1974–75 dossier . . . .

If there are any questions on this matter please call me.

Vice Chancellor Ashton testified that no one contacted him to protest any part of his memorandum.

There is no evidence that Mr. Ishigami was ever told that any earlier criteria would be used on his reapplication. The evidence is also clear that he wanted the earlier criteria to apply (in selecting option 1 he crossed out the words "appropriate to my application" in acknowledging receipt of "a copy of the authorized criteria for tenure"), but, in my opinion, he was not entitled to have it so.

█ The complaint alleges a denial of equal protection in that Mr. Ishigami was not evaluated for tenure in the same manner as other faculty members. The evidence and argument presented was statistical, that is, that almost everyone on the faculty at the University of Hawaii who applies gets tenure, especially if the original evaluating faculty committee (DPC) votes to recommend tenure. There are some who do not apply for tenure, and some who are not recommended by the DPC. But by and large, at least statistically, getting a job on the faculty at the University more often than not results in tenure.

The argument is unconvincing. If followed, it would lead to enshrining the Peter Principle in the Constitution. Surely bad practices need not be perpetuated in the name of the Fourteenth Amendment.

The complaint alleges that the "Defendants failed and refused to follow certain rulings of arbitrator Daral Conklin pertaining to how Plaintiff was to be re-evaluated for tenure." From the evidence I find, to the contrary, that the several levels of review at the University scrupulously followed the Arbitrator's rulings.

## DISCRIMINATION ON THE BASIS OF NATIONAL ORIGIN

█ Mr. Ishigami asserts that Dr. Niyekawa discriminated against him because of his Japanese national origin.

Evidence was adduced that Dr. Niyekawa had demonstrated her prejudice against Asian-born and educated faculty members at Department faculty meetings, to her classes, and in her 1975 Program Review. At the first Department faculty meeting after she became chairman, she was understood, by those who testified in this area, to have called the native Japanese teachers in the Department "substandard people brought from Japan" who were "unprofessional" and "unethical." The timing of these remarks was considered to have been intentionally designed to humiliate and degrade such faculty members.

She was also heard to have characterized native Japanese to her classes as "vicious."

Finally, her statements about the Department faculty in her "Departmental Self-evaluation" under "Present weaknesses" as originally drafted, and even as later modified, are cited as evidence of her prejudice. The original draft regarding the faculty read:

Composition of faculty—Due to a peculiar past when the major qualification for hiring in the Department was to be a native speaker of the language to be taught and when Ph.D.s were not particularly welcome, our Department has become a bottom heavy department. Aside from those who went with the Literature Department at the time of the split the first Ph.D. to stay long enough in this Department to earn tenure received his tenure in 1972. Currently there are only two faculty members at rank V (one of whom will retire at the end of this academic year), 14 at rank III, and 17 (full-timers), at rank II. Slightly less than 50 percent of the full-time faculty is tenured. Of the 22 tenured faculty, 15 or 68 percent are non-Ph.D.s who, with the exception of one, have never taught nor studied (as degree students) at any American university other than the UH. The vast majority of M.A. degrees held by them were obtained from our own Department or from sister departments (ESL, Linguistics) while the individuals

were teaching in this Department as graduate assistants or as full-time instructors. The extent of inbreeding is thus extraordinary and unhealthy.

The past emphasis on native speaker teachers is also reflected in the ratio of foreign born versus U.S. born among the tenured faculty. Eighty-two (82) percent of the Tenure Committee members were born and raised in China (including Taiwan), Japan or Korea. While the Ph.D.s have gone through the American educational system before joining this Department, their experiences are limited to those as students. We therefore had a Department in which there was not a sufficient number of Americans in leadership roles to set a pattern in the Department for democratic procedures.

An effort to correct the imbalance in the Department is beginning to show its effects. While the ratio of full-time faculty members who have had learning and/or teaching experience at some other U.S. university besides the UH as opposed to those limited to the UH was 16:26 in the fall of 1973, it now is 19:19. Similarly the ratio of U.S. born versus foreign born has improved from 5:37 to 10:28 in the same period. The same trends are found among part-time instructors, lecturers and graduate assistants. The proportion of Ph.D.s among the full-time faculty has also increased from 31 percent in 1973 to 42 percent at present.

While there has been some visible progress in making the faculty composition less lopsided, we are still seriously handicapped by the fact that there are so few faculty members who can write with ease well organized proposals, reports or even memos in comprehensible, good English.

The draft was circularized to some extent and developed so much adverse reaction that Dr. Niyekawa modified the second paragraph to read as follows:

The past emphasis on teachers who are native speaker of the target language is also reflected in the ratio of native speak-

ers of English versus non-native speakers of English among the tenured faculty. Eighty-two (82) percent of the Tenure Committee members are non-native speakers of English with limited exposure to U.S. systems. The experiences of most of those who have gone through the American educational system before joining this Department, are limited to those as students, not as full-time faculty members in departments at other American universities.

She also amended the third sentence of the next paragraph to read:

Similarly the ratio of native speakers of English versus non-native speakers of English has improved from 5:37 to 10:28 in the same period.

This critical look at the faculty of the Department did not begin with Dr. Niyekawa. Dean Contois testified that the East Asian Languages Department was in an unsatisfactory condition in 1973. There was factionalism among the members of the faculty to such an extent that the Department was divided into three parts—Literature, Indo-Pacific, and East-Asian—in an attempt at a cure for the resulting problems. There was some bad feeling between those who had been recruited by a predecessor chairman of the Department and those recruited later. The charge had been made that earlier recruitment had been too loose. Although not stated explicitly, a tightening up of recruitment and tenure standards by Dr. Niyekawa was obviously supported by higher University administrative levels.

On October 19, 1976, a Step 1 "class grievance" was filed by the UHPA "on behalf of some of your former faculty." The grievance was stated as follows:

UHPA has been informed and believes and therefore alleges that certain faculty members as a class have been discriminated against because of their national origin. These faculty members include . . . [four other named individuals] Y. Ishigami and others from the Department of East Asian Languages.

The alleged violation was stated to have first become known in May 1975. The remedy sought was:

1. Re-hire all persons in the Department of East Asian Languages that were discriminated against retroactive to the date of termination.
2. Any and all other appropriate relief and/or all monies lost.

This grievance was rejected by Dean Contois on the ground that it was more than a year since the alleged violation occurred. He also raised a question as to the right of UHPA to represent persons who were no longer faculty members. He noted further that there was no evidence or basis to support the charge "other than the fact that the individuals involved had a common national origin, which was and is the same as that of about 50% of the faculty of the department." A Step 2 grievance to Chancellor Yamamura filed on October 28, 1976, and a Step 3 grievance to President Matsuda filed on November 17, 1976, were likewise rejected, although apparently to get around the one-year limitation, the alleged violation was stated to be "Continuing."

This "class grievance" was filed the day after Mr. Ishigami requested the UHPA to take his second denial of tenure to arbitration. Prior to that time, Mr. Ishigami had never alleged discrimination on the basis of national origin in connection with his grievances.

Mr. Ishigami did agree with his attorney that when he had "won at the arbitration proceeding" he had met with Mr. Comcowich (of UHPA) "to ask him to ask the University to have Dr. Niyekawa disqualify herself" because he felt she was prejudiced against him "by national origin." This is rather weak evidence which strikes me as more of an attempt to raise possible Constitutional issues after the fact than something that was really agitated at the time. This does not mean, of course, that Mr. Ishigami cannot raise the issue now; but it does weaken his claim that he really thought that Dr. Niyekawa was prejudiced against him on the basis of his Japanese national origin.

No doubt there was some smoldering resentment against Dr. Niyekawa's obvious policy of favoring faculty members with training and experience at American universities other than the University of Hawaii and with higher academic degrees. But this resentment did not take on a "racial" or "national origin" dimension until about October 1976.

An ironic aspect of the situation is that Dr. Niyekawa is of Japanese ancestry, was born in Japan, spent her early childhood from about ages 4 to 10 in Austria, went back to Japan at age 10 by which time her first language was German, came to the United States as an alien, had been with the University of Hawaii on and off for about seven years before she became chairman of the Department on July 19, 1973, and had herself formally complained that the East-West Center had discriminated against her because of her sex and race.

Mr. Ishigami's attorney attempted to develop some sort of psychological wound which she is supposed to have suffered when she returned to Japan at age 10 and could not speak Japanese and was therefore subjected to teasing and ridicule by her classmates. This is supposed to have resulted in her now having a subconscious, or even conscious, hatred of alien Japanese. It made an interesting argument but the proof fell far short of even raising a suspicion that this might be so.

Dr. Niyekawa has in fact recommended some alien Japanese for tenure. The makeup of the faculty of the Department includes several Asian-born members.

I find that Mr. Ishigami has failed to make out a case of discrimination against him on the basis of race or national origin.

Assuming for the sake of argument that Dr. Niyekawa recommended against tenure only because Mr. Ishigami was a Japanese alien, every other person in the further tenure review process was unaware that he was an alien.

I find from the evidence that Mr. Ishigami was denied tenure because the Department of East Asian Languages already had enough tenured faculty members with his qualifications and that the needs of the Department were thought to require more

tenured members having better qualifications than Mr. Ishigami in terms of education, experience, research, and recognition.

### THE PENDENT CLAIM

■ Mr. Ishigami has attached to his complaint a pendent claim for breach of contract. This claim depends upon facts which do not involve any federal issue. The dispute would not, standing alone, qualify for federal jurisdiction. Since I conclude that his first cause of action must fail, I do not consider his second cause of action for lack of jurisdiction.

### CONCLUSION

Defendants are entitled to judgment dismissing the First Cause of Action.

The Second Cause of Action should be dismissed by the court, without prejudice, for lack of jurisdiction.

The foregoing constitute the court's findings of fact and conclusions of law.